IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANTHONY JONES,                          )
                                        )
            Plaintiff,                  )
                                        )
                                        )   No. 11 C 1608
v.                                      )
                                        )   Magistrate Judge Sidney I. Schenkier
CAROLYN W. COLVIN, Acting               )
Commissioner of Social Security,[1]     )
                                        )
            Defendant.                  )

## MEMORANDUM OPINION AND ORDER[2]

Anthony Jones seeks an order reversing or remanding the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") (doc. # 24: Pl.'s Br. in Supp. of Summ. J. ("Pl.'s Br.")). The Commissioner has filed a motion seeking to affirm the denial of benefits (doc. # 28: Def.'s Mot. in Supp. of Summ. J. ("Def.'s Mot.")). For the reasons set forth below, we grant the Commissioner's motion and deny Mr. Jones's motion.

### I.

On January 31, 2006, Mr. Jones applied for DIB and SSI, alleging that he became unable to work due to a disability beginning on November 1, 2005 (R. 19). His applications were denied initially on May 18, 2006, and upon reconsideration on July 7, 2006 (R. 72-75). On February 3, 2009, after a hearing, the Administrative Law Judge ("ALJ") issued a written decision finding Mr. Jones was not disabled and denying benefits (R. 34). The Appeals Council

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin is automatically substituted for Michael J. Astrue as defendant.

[2] On December 18, 2012, by consent of the parties and in accordance with 28 U.S.C. § 636(c), this matter was reassigned to this Court for all further proceedings, including the entry of final judgment (doc. # 10).

granted Mr. Jones's request for review and affirmed the ALJ's findings on January 14, 2011 (R. 7). making the Appeals Council's decision the final decision of the Commissioner.[3] *Walgren v. Colvin*, No. 12 C 6378, 2013 WL 4659565, at *1 (N.D. Ill. Aug. 29, 2013).

## II.

We next summarize the administrative record. We begin by setting forth the general background in Part A, the medical record in Part B, and the hearing testimony in Part C. Part D addresses post-hearing evidence, and Part E reviews the ALJ's written opinion.

## A.

Mr. Jones was born on April 17, 1956, and was 52 years old at the time of the hearing (R. 43). He completed eighth grade and attended some high school, but he does not have any vocational certification (R. 43-44). He reported that he cannot read, but he can count change and take a phone message (R. 45-46). He is five-feet eleven-inches tall and, at the hearing, weighed approximately 240 pounds (R. 46).

Mr. Jones lives with his sister (R. 50), and before that, he lived with his brother (R. 63). His sister does the shopping, cooking, and most of the cleaning, but he is able to heat up frozen dinners, clean dishes, and dust his room (R. 50-51, 162, 247). Mr. Jones does not drive; he gets driven by family members or uses public transportation (R. 164). He testified that he spends most of the day sleeping because his body hurts so badly (R. 51). He reported being nervous and frightened around others in social settings, but he had a girlfriend for several years and has good relationships with family members (R. 247).

---

[3]The Appeals Council adopted the ALJ's findings and conclusions regarding whether Mr. Jones was disabled and agreed with the ALJ's Steps 1, 2, 3, and 4 findings (R. 4). While the Appeals Council purported to disagree with the ALJ's finding that the claimant has the RFC for "the full range of light work." it "adopt[ed]" the ALJ's restriction to "simple, routine tasks, limited contact with the public, employees, and supervisors, and cannot be exposed to unpredictable workplace stresses" (R. 5-6). Thus, while the Appeals Council's decision initially misstated the ALJ's opinion as allowing for the full range of light work, it actually adopted the ALJ's RFC finding, including the aforementioned restrictions, in its entirety (*see* R. 24-25).

At the time of the hearing, Mr. Jones was taking 400 milligrams of ibuprofen for his pain and medication for high blood pressure (R. 52). His only past employment was as a cook's helper at Harold's Chicken Shack (R. 66). He testified that he was terminated because he would drop things since his hands would swell (R. 49).

**B.**

The earliest medical report in the record is dated September 11, 2005, when Mr. Jones was admitted to Jackson Park Hospital for chest pain (R. 209). He reported that he had experienced chills and burning pain in his chest ever since he had worked in a walk-in freezer three years before (R. 216). The intake sheet noted his history of high blood pressure, a gunshot wound to his right leg in 1995, and daily alcohol and marijuana use (R. 216, 218). In October and November 2005, Mr. Jones went to the hospital to follow-up and obtain refills of his blood pressure medication (R. 239-43).

Over the course of the next three years, Mr. Jones made dozens of trips to the hospital to refill his medication and to check his blood pressure. At these follow-up visits, Mr. Jones occasionally described pain in his lower back, right leg, and left hand, and the medical reports sometimes circled "yes" for depression and pain. In addition, on January 17, 2006, Mr. Jones complained of having chills for the past eight years, a knot on his back, and shaking and tingling in his hands and body, which subsided with the blood pressure pill (R. 237, 348).

On January 24, 2006, Mr. Jones complained of swelling and pain in his right foot after standing for long periods of time, shaking and tremors, and chest pain at night (R. 235). He also complained of swelling in his right foot and pain in his right calf on February 7, and March 14, 2006 (R. 231, 233). He reported that the pain and swelling goes away with medication or lying

down (R. 233). Mr. Jones also reported having seizures, sweating, and palpations, but the seizures stop when he does not drink alcohol (*Id.*).

On April 17, 2006, Mr. Jones was examined by internal medicine consultative examiner, Romi Sethi, M.D., at the request of the Bureau of Disability Determination Services ("DDS") (R. 253). Mr. Jones reported being disabled due to a gunshot wound, hypertension, liver condition, seizure disorder, depression, and learning disability (*Id.*). He complained of pain and swelling in his right leg with prolonged standing (*Id.*), and Dr. Sethi observed "chronic" swelling at the site of the bullet wound but no calf tenderness (R. 255). Dr. Sethi observed that Mr. Jones had full range of motion in all joints, was able to bear his own weight, and his gait was normal (*Id.*). He was able to heel walk, toe walk, squat down, and do the tandem gait, and he did not need an assisting device to ambulate (*Id.*). Dr. Sethi also observed that Mr. Jones had normal lumbar curvature with no muscular spasm or tenderness, and the range of motion in Mr. Jones's back was within normal limits (*Id.*). In addition, his finger grasp and handgrip were unimpaired bilaterally, and his blood pressure was good (R. 255-56). Mr. Jones reported that he stopped drinking in 2005, but he had generalized shakes and he had four seizures in the past three months, which may or may not be alcohol related (R. 253-54). Mr. Jones also stated that he has suffered from depression for seven to eight years (*Id.*).

On the same day, Mr. Jones was examined by a psychiatric consultative examiner, John W. O'Donnell, M.D., at the request of DDS (R. 245). Dr. O'Donnell noted that Mr. Jones had a mild limp on his right leg, but he was not using a cane (*Id.*). Mr. Jones reported that he was often cold, shaking, and trembling, and he started having seizures one year ago, but he was not tremulous during Dr. O'Donnell's exam (*Id.*). He also stated that his last drink was two years ago, and he last smoked marijuana one year ago (R. 246). Mr. Jones reported that his depression

began in November 2005 when he stopped working; he was not depressed every day, and his good and bad days were split evenly (*Id.*). He often felt irritable, frustrated, and sad, and his mood was "hurting" because his legs hurt and he had a bump on his back (R. 248). Mr. Jones told Dr. O'Donnell that he showered and dressed every day, and he sometimes cleaned his room, did the dishes, or heated up a frozen meal; otherwise, his girlfriend cooked, grocery shopped, and did his laundry (R. 247).

Dr. O'Donnell concluded that Mr. Jones did not have disturbance in perception, content of thought, or form of thought, but he had difficulty with abstract thinking, similarities and differences, and calculations, so he could not manage his own money (R. 249-50). He diagnosed Mr. Jones with polysubstance abuse in full sustained remission, depressive disorder NOS, learning disability NOS, and possible cognitive disorder (R. 250-51). Dr. O'Donnell opined that Mr. Jones's reliability and cooperation varied from fair to poor, and he listed Mr. Jones's prognosis as "guarded" (R. 251).

On May 2, 2006, Francis Vincent, M.D., reviewed Dr. Sethi's report and filled out a Physical Residual Functional Capacity ("RFC") Assessment based on a primary diagnosis of seizure disorder and a secondary diagnosis of gunshot wound to the right lower leg (R. 257). Dr. Vincent opined that Mr. Jones had no exertional, manipulative, visual, communicative, or environmental limitations, except that he should avoid concentrated exposure to hazards and should never climb ladders, ropes or scaffolds due to his history of seizures, which Dr. Vincent attributed to alcohol abuse (R. 258-61, 264). Dr. Vincent's opinion was affirmed on reconsideration the following month (R. 288-89).

On May 12, 2006, psychologist Joseph Cools, Ph.D., reviewed Dr. O'Donnell's report and opined on Mr. Jones's mental RFC (R. 266). Dr. Cools opined that Mr. Jones's mental

impairments – depressive disorder NOS, polysubstance abuse in full remission – were not severe and did not meet a listing (R. 270, 272). He concluded that Mr. Jones suffered from only mild restrictions in activities of daily living ("ADLs"); no difficulties in maintaining social functioning, concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration (R. 271). Dr. Cools found that Mr. Jones was fully independent for routine ADLs since he lived with his brother, a flight attendant, who was out of town for days at a time, but his girlfriend helped him clean and cook (R. 272). He found Mr. Jones's statements partially credible (*Id.*). Dr. Cools's opinion was affirmed on reconsideration (R. 290-91).

At his doctor's visit on June 5, 2006, Mr. Jones complained of constant, severe right leg pain, but he reported that the pain went away when he was not standing (R. 337). He also complained of leg pain and swelling on September 20, 2006 (R. 334) and December 16, 2006 (R. 333). He was referred to an orthopedist, but he never met with one (*Id.*).[4]

During that June 5, 2006 visit, Mr. Jones also complained of sporadic pain in his left hand and wrist (R. 337-38). His left hand pain was slightly better on July 15, 2006, but he still rated the pain as an 8 out of 10 (R. 336). On September 20, 2006, Mr. Jones complained of bilateral arm pain (R. 334), and on December 28, 2006, he complained of pain, burning, and swelling in his hands (R. 331). The physician prescribed ibuprofen and ordered x-rays of his hands, but Mr. Jones did not get x-rays done (R. 332).[5] At a doctor visit on November 7, 2006, Mr. Jones also complained of a shaking and tingling episode after heavy alcohol use (*i.e.*, a 12-

---

[4] The record does not contain an explanation as to why Mr. Jones did not visit the orthopedist. While Mr. Jones testified that he does not have a medical card (R. 45), and that Cook County Hospital and Access Healthcare turned him away (R. 41-42), there is no evidence that the orthopedic visit would have taken place at those facilities as opposed to the facilities where Mr. Jones received treatment.

[5] As with his failure to visit an orthopedist, the record does not contain an explanation as to why Mr. Jones did not obtain the x-rays.

pack of beer each day), though he claimed to have stopped drinking four months before (and on April 17, 2006, he reported that he stopped drinking two years before that) (R. 237-38).

In 2007, at hospital visits to refill his blood pressure medication, Mr. Jones continued to complain of hand and leg pain or swelling. On May 17, 2007, Mr. Jones reported swelling in his leg after standing all day (R. 326), and on June 23 and August 9, 2007, he reported hand pain, but on June 23, his left hand strength had improved to a 5/5 (R. 323-24).

On September 19, 2007, Mr. Jones complained of wrist pain, and the doctor noted carpal tunnel syndrome (R. 321). He was advised to see a physical or occupational therapist for his hand pain (R. 322), but for reasons unknown, he never did. On October 20, 2007, he reported pain in both legs, and the doctor's notes again indicated carpal tunnel syndrome (R. 320). The next month, on November 17, 2007, Mr. Jones reported that he was suffering generalized aches throughout his body, which he described as a seven on a ten-point scale of severity (R. 318). He did not report any aggravating or mitigating factors, and he did not take medication for the pain (*Id.*).

From January to June 2008, Mr. Jones's complaints of pain continued. At a routine medication follow-up visit on January 18, 2008, he complained of carpal tunnel and stomach pain (R. 315). On March 3, 2008, Mr. Jones went to the emergency room complaining of right leg pain from his old gunshot wound, chest pain, and "cold in [his] bones" (R. 294, 297, 301). No redness or swelling was noted (R. 301), but an x-ray of his right leg revealed degenerative changes to the knee and ankle joint, no acute fractures or dislocations, and evidence of deformities of the right tibia and fibula with multiple metallic fragments from the gunshot wound (R. 306). Upon discharge, Mr. Jones was prescribed 800 milligrams of Motrin, and his gait was ambulatory and steady (R. 296, 301).

At a follow-up visit on April 12, 2008, Mr. Jones complained of generalized body aches, carpal tunnel syndrome, and numbness in hands, though his hands were slightly less painful than at his previous visit (R. 312). On May 15, 2008, he complained of sharp, tingling pain and swelling in his right leg when walking or standing for a while (R. 310). The doctor noted that Mr. Jones's right leg was bigger than his left, and he referred Mr. Jones to an orthopedic doctor (R. 311), whom – again for reasons unknown – Mr. Jones never visited.

## C.

Mr. Jones's administrative hearing was held on June 23, 2008 (R. 35). At the start of the hearing, his attorney discussed amending the onset date from November 1, 2005, to April 2006, when he turned 50, so that he would be found disabled if restricted to sedentary work (R. 40).

Mr. Jones testified that he is unable to work because his body "is all messed up" and hurting, and he has to "lie down all the time" because his legs swell up "all of the time" (R. 48, 51). His left leg hurts the most (R. 58). Mr. Jones had a cane at the hearing, and he testified that he bought himself a cane for his left side because his legs were bothering him (R. 50). In addition, he testified that his hands bother him all of the time, his left hand more; they began to hurt and swell up "about two years ago" after lifting baskets at work (R. 47). He wore splints on his hands, which he stated were prescribed by a physician at Jackson Park Hospital (Id.). Mr. Jones also testified that his head and back hurt, and that he is cold all of the time (R. 48, 54), but he has not had any seizures recently (R. 61). He rated his hand, leg, and back pain at a ten (R. 57-59), and stated that he was taking ibuprofen for his pain (R. 52). He does not have a medical card (R. 45), and Cook County Hospital and Access Healthcare turned him away (R. 41-42).

Mr. Jones watches television and occasionally goes for short walks, but his legs start hurting after walking about one block (R. 52-53, 60). He testified that he has to lie down after

sitting for about 45 minutes, and he cannot lift a gallon jug with either hand (R. 60-61). Mr. Jones also testified that he gets depressed and "feels bad all the time" (R. 62).

The ME, psychologist Ellen Rozenfeld, testified next. She reviewed Mr. Jones's diagnoses described by the psychological consultative examination in April 2006: depressive disorder NOS, learning disorder NOS, possible cognitive disorder NOS, and polysubstance abuse, in full sustained remission (R. 63). She testified that Mr. Jones's mental impairment does not meet a listing, but that she would limit Mr. Jones to simple routine tasks based on his cognitive impairment (R. 63-64). In addition, she would limit the interaction he has with the general public to directing customers and interacting with coworkers and supervisors, but he could not be a source of important information (R. 64-65). Dr. Rozenfeld also recommended a workplace with moderately reduced stress and limited to more routine, repetitive work stresses (*Id.*).

Susan Entenberg, the VE, then testified that Mr. Jones had no transferable skills (R. 65-66). The ALJ asked her to assume an individual the same age, educational background, and past work experience as the claimant, with an RFC for medium work with no exertional limitations, except no ropes, ladders or concentrated hazards, and limited to simple, routine tasks in a non-stressful environment with limited interaction with the public (R. 66). The VE testified that such a person could perform Mr. Jones's past work as a cook's helper (*Id.*).

The ALJ next asked the VE to assume an individual who could perform the full range of light work, but was limited to interacting with people as in the previous hypothetical (R. 66). The VE testified that there would be light, unskilled jobs for the claimant, including light housekeeping, food preparation worker, and packer (R. 67). However, if reduced to sedentary work, the claimant would be found disabled under the Medical-Vocational Guidelines (*Id.*).

At the end of the hearing, the ALJ held a discussion with Mr. Jones's attorney regarding the evidence of Mr. Jones's hand complaints and carpal tunnel syndrome, and Mr. Jones stated that he tells the doctors about his problems with his hands and legs every time he goes to Jackson Park (R. 67-70). The ALJ concluded that she had sufficient evidence to reach a decision (R. 70).

**D.**

Nevertheless, after the hearing, on July 29, 2008, an orthopedic consultative examiner, Dr. Elmes, examined Mr. Jones at the request of DDS (R. 355).[6] Mr. Jones told Dr. Elmes that on a zero to ten scale, he had back pain ranging from six at best, to nine at worst (*Id.*). Lifting, bending, and twisting aggravates his back pain, but it can be relieved with moist heat, massage, aspirin, and rest (*Id.*). Mr. Jones reported that he takes 400 milligrams of ibuprofen three times daily for pain (*Id.*). An x-ray showed some "slight narrowing" and lateral spurring in his spine (R. 357). Dr. Elmes concluded that Mr. Jones suffered from early degenerative disc disease at the L2 and L5 levels, and mild degenerative changes of the lumbar spine (*Id.*).

Mr. Jones also reported left leg pain and episodic right leg numbness and pain (R. 356). At the examination, he used a cane on the right for ambulation and a right knee sleeve for support (R. 357). Dr. Elmes observed that Mr. Jones had an antalgic gait and slight limp, but the range of motion in his joints was normal, except his right knee had a maximum flexion to 138 degrees (with normal being 150) (R. 357-58). He complained of right thigh, leg, knee, and foot pain while squatting and walking on his toes and heels, and he had to lean on the counter for support, but he could dress and undress himself and get on/off the examination table unassisted (R. 357). Mr. Jones told Dr. Elmes that he can only sit for twenty minutes, walk one block outside or 50 feet inside, and stand for fifteen minutes continuously (R. 356-57).

---

[6]Although Dr. Elmes's report states that he conducted the consultative examination of Mr. Jones for DDS (R. 355), there is no further indication in the record of who in particular requested the examination or why it was requested.

Mr. Jones also reported bilateral wrist pain with repetitive activity and episodic numbness in his hands, and he reported using hand and wrist splints for the last four years (R. 356-57). He can button, zip, and write "without difficulty" with his right hand, but he cannot tie shoes and occasionally drops things because of decreased left hand dexterity and grip strength (*Id.*). Tests were negative bilaterally for Tinel's and Phalen's signs (tests for carpal tunnel), and Mr. Jones's fine and gross motor coordination was "fairly normal" (R. 357).

Dr. Elmes also filled out a "medical source statement of ability to do work-related activities (physical)." He opined that Mr. Jones could only occasionally (up to 1/3 of the work day) lift and carry up to five pounds, reach overhead, handle, finger, feel, and push or pull with his hands, but he could frequently do all other reaching with his hands (R. 361, 363). In addition, Dr. Elmes concluded that Mr. Jones required a cane to ambulate, but could ambulate without a cane up to 50 feet (R. 362). He wrote that Mr. Jones can sit for twenty minutes, stand for fifteen minutes, and walk for fifteen minutes at one time; in an 8-hour work day, he could sit for four hours and stand or walk for 1.5 hours, but he would need to lie down the rest of the day (*Id.*). Mr. Jones could never climb ladders or scaffolds, crawl, or be around unprotected heights, moving mechanical parts, humidity, wetness, extreme cold, or vibrations (R. 364). He could occasionally climb stairs and ramps, balance, stoop, kneel, or crouch and be around dust, odor, fumes, or extreme heat (R. 365).

### E.

On February 3, 2009, the ALJ issued a written opinion concluding that Mr. Jones was not disabled (R. 19). She applied the standard five-step inquiry for determining disability, which required her to analyze whether Mr. Jones (1) had not engaged in substantial gainful activity since the alleged onset date; (2) had a severe impairment or combination of impairments; (3) had

an impairment that met or equaled any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) could perform his past relevant work; or (5) was capable of performing any other work in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

At Step 1, the ALJ determined that Mr. Jones had not engaged in substantial gainful activity since November 1, 2005, the (original) alleged onset date (R. 21). At Step 2, the ALJ deemed the following impairments severe: early degenerative disc disease at L2 and L5; mild degenerative changes in the lumbar spine; obesity; hypertension; history of gunshot wound to the right leg; bilateral non-specific wrist and hand pain; and major depressive disorder (*Id.*). The ALJ found that Mr. Jones's alcohol and drug abuse were not severe because they were in full sustained remission (R. 21-22). In addition, Mr. Jones's seizures were not severe because the medical records showed that the seizures ceased after he stopped drinking (*Id.*). The ALJ characterized Mr. Jones's complaints of general non-specific pain as not severe because of the lack of medical evidence, as well as the few, if any, limitations it would cause regarding Mr. Jones's ability to perform basic work activities (R. 22). The ALJ also found that Mr. Jones's alleged learning disability was not severe because he had worked in the past and was independent in his ADLs, and "there is nothing in the record to support a learning disability" (*Id.*).

At Step 3, the ALJ found that Mr. Jones's medical conditions did not meet or medically equal a listed impairment (R. 22). *First*, regarding Mr. Jones's spine and disc degeneration, the ALJ considered Listing 1.04, and determined that there is no evidence of lasting or ongoing loss of motion of the lumbar spine or positive straight-leg raising as required by the listing (*Id.*).

*Second*, the ALJ found that Mr. Jones's hypertension did not meet Listing 4.00H because it was stabilized with medication and caused no other complications (*Id.*; R. 29).

*Third*, the ALJ determined that Mr. Jones's history of gunshot wound and leg pain does not meet Listing 1.02 as "there is no evidence establishing an inability to ambulate effectively" as defined in 1.00B2b,[7] because Mr. Jones did not need a walker or two crutches, and the record did not show if or when Mr. Jones's cane was prescribed (R. 22). Also, Mr. Jones could use public transportation, carry out ambulatory ADLs, and climb stairs (*Id.*).

*Fourth*, the ALJ found that Mr. Jones's hand pain did not meet or medically equal the criteria of Listing 1.02 because the evidence did not show an inability to perform fine and gross movements effectively as defined in 1.00B2c[8] (R. 23). Although the consultative examination showed "some decreased grip strength," Mr. Jones's fine and gross motor coordination were "fairly normal" (*Id.*). In addition, the ALJ noted that Mr. Jones used his upper extremities effectively in carrying out his ADLs, and tests were negative for Tinel's and Phalen's signs (*Id.*).

Separately, the ALJ also noted that that based on his height and weight, Mr. Jones is considered obese (R. 29). Although he had never sought treatment for obesity or complained that his weight affected his ADLs, the ALJ considered that obesity could exacerbate his other impairments, specifically, his back and leg complaints (*Id.*).

---

[7] Listing 1.00B2b(1) defines an inability to ambulate effectively as "an extreme limitation of the ability to walk," "defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." Listing 1.00B2b(2) includes examples of ineffective ambulation, such as "the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces. . . ."

[8] Listing 1.00B2c defines an inability to perform fine and gross movements effectively as "an extreme loss of function of both upper extremities" such that the individual cannot "sustain[] such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living." The listing includes examples of an inability to perform fine and gross movements, including "the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level."

The ALJ then applied the Paragraph B criteria to determine whether Mr. Jones's mental impairment met or medically equaled Listing 12.04 (R. 23). The ALJ determined that mild restrictions in ADLs were appropriate because Mr. Jones could attend to his own hygiene, take public transportation, and, despite the fact that his family did most of the cooking and shopping, he could prepare simple meals, do light dusting, clean his room, and wash dishes (*Id.*). The ALJ also found mild restrictions in Mr. Jones's social functioning because although he did not go out much and reported being afraid and nervous around people and having a quick temper, he had good relationships with his brother and sister, with whom he lived, and he had a girlfriend for years (R. 23-24). The ALJ found that Mr. Jones had moderate difficulties in concentration, persistence, and pace because he reported that he was often tired, easily confused, and he had trouble completing tasks and remembering things (R. 24). The ALJ found no evidence that Mr. Jones experienced any episodes of decompensation for an extended duration (*Id.*). Thus, the ALJ found that the neither the paragraph B nor paragraph C criteria were satisfied (*Id.*).

The ALJ then determined that Mr. Jones had the RFC to: "lift/carry 20 pounds occasionally and 10 pounds frequently; sit 6 hours and stand/walk 6 hours in an 8-hour workday; unlimited pushing/pulling; no limitations regarding vision, manipulation and communication; simple routine tasks; limited contact with public, employees, supervisors; and predictable workplace stresses" (R. 24-25).

In rejecting Mr. Jones's claim that he was more limited, the ALJ found that Mr. Jones had "limited credibility" and "exaggerated his symptoms" (R. 26). *First,* with regard to his back pain, the ALJ found that Mr. Jones's allegations of extreme symptoms and functional limitations were not supported by the record (*Id.*). The ALJ reasoned that Mr. Jones never complained of nor sought treatment for back pain, and his pain management was limited to over-the-counter

medication (*Id.*). The ALJ also pointed to Dr. Sethi's examination results that found no deformity, normal lumbar curvature, no muscular spasm or tenderness, normal range of motion, and negative straight leg testing (*Id.*). In addition, the ALJ found that Mr. Jones's report to Dr. Elmes that his back pain prevents him from sitting for more than 20 continuous minutes was "directly contradicted" at the hearing, where Mr. Jones was able to sit for approximately one hour without needing to lie down (*Id.*). Furthermore, Mr. Jones testified at the hearing that his back pain was at a constant 10, but he told Dr. Elmes that his back pain ranges in severity from a 6 to a 9 (*Id.*). The ALJ concluded that these inconsistencies suggest that Mr. Jones was not entirely reliable or credible with regard to his allegations of back pain (*Id.*). Moreover, the results of Dr. Elmes's diagnostic testing were "minimal," "only reveal[ing] early degenerative disc disease" and "mild degenerative changes" (R. 27).

*Second*, the ALJ found that Mr. Jones's description of his leg pain was only "somewhat credible" because his description "has been so extreme as to appear implausible" (R. 28). While Mr. Jones rated his leg pain as a 10 out of 10 at the hearing, and told Dr. Elmes that he had episodic numbness, buckling, and pain in his legs, Mr. Jones had not consistently sought treatment or complained of the pain (R. 27-28).[9] The ALJ noted that despite complaining to doctors of pain and swelling in his right leg, Mr. Jones told Dr. Sethi that he could walk on a regular basis without an assisting device, and Dr. Sethi noted swelling at the bullet site but no calf tenderness, full range of motion and motor strength, and ability to heel walk, toe walk, and squat (*Id.*). In addition, Mr. Jones was referred to an orthopedic doctor, but he never made the appointment (R. 27). Because Mr. Jones visited the hospital for other medical issues, the ALJ found it was not credible for Mr. Jones to "remain silent about severe pain" (*Id.*).

---

[9] The ALJ stated that Mr. Jones had allowed one year (2007) to pass without complaining of leg pain. The record, however, shows that Mr. Jones did complain of leg pain on two occasions in 2007. This discrepancy does not impact the analysis in this opinion.

The ALJ disagreed with Dr. Elmes's opinion as to Mr. Jones's functional limitations because Dr. Elmes "appeared to take the claimant's complaints as fact and also may have been sympathetic to the claimant" (R. 28). The ALJ found this rendered Dr. Elmes's opinion "less persuasive, especially since I find claimant to be a less than credible witness" (R. 29). Furthermore, Dr. Elmes's opinion "simply contrasts sharply with the objective evidence of record," and is "not supported by the underlying objective findings made by Dr. Elmes" (*Id.*). The ALJ found Mr. Jones's statements about his need for an assistive device to walk were inconsistent with the lack of signs and findings establishing that he needs a cane (R. 32).

*Third*, the ALJ questioned Mr. Jones's claims as to the severity of his hand pain, because he only sporadically complained about it during his hospital visits and never saw a physical therapist or had x-rays taken of his hands, despite being advised to do so (R. 29-30). Furthermore, the ALJ noted that diagnostic tests in June 2007 showed 5/5 upper extremity strength, Phanel and Tinel tests were negative, and Dr. Elmes measured 4/5 strength and found that Mr. Jones's fine and gross motor coordination were "fairly normal" (*Id.*). In addition, although Mr. Jones wore wrist splints to the hearing, the ALJ noted that the record is unclear as to when Mr. Jones was first told to wear them to relieve carpal tunnel pain (*Id.*).

Ultimately, the ALJ limited Mr. Jones to a light work RFC because, giving Mr. Jones the "benefit of the doubt," the ALJ found that Mr. Jones may suffer some pain in his hands, back, legs, and knees, that in combination with his obesity would cause him some limitations, just not to the extent Mr. Jones alleged (R. 29-30). The ALJ gave "lesser weight" to the opinions of the state agency consultants who did not limit Mr. Jones to light work but restricted him to no ladders, ropes, and scaffolds (R. 31). Because the record showed that Mr. Jones no longer had seizures, the ALJ opined that the latter restriction was unnecessary (R. 31-32). She gave

"significant weight" to the results of Dr. Sethi's and Dr. Elmes's diagnostic testing, but "little weight" to Dr. Elmes's opinion of Mr. Jones's RFC, because, as explained above, the ALJ found that it "contrasts sharply" with the other evidence of record (R. 32).[10]

The ALJ also found that Mr. Jones was not entirely reliable or credible as to his complaints of depression because he never sought or received treatment or medication for depression (R. 30-31). In addition, despite testifying that he feels bad all the time, Mr. Jones told the psychiatric consultative examiner, Dr. O'Donnell, that his good days and bad days were split equally (*Id.*). Further, Mr. Jones's report to Dr. Sethi that he had suffered from depression for seven to eight years conflicted with his report to Dr. O'Donnell that his depression began in 2005 when he stopped working (*Id.*). Nevertheless, the ALJ gave Dr. O'Donnell's and the ME's opinions "significant weight," and thus, the ALJ added mental limitations to Mr. Jones's RFC, including, as suggested by the ME, limiting him to simple, routine tasks with little contact with the public, employees, and supervisors, and predictable workplace stresses (R. 31). The ALJ gave "little weight" to the non-examining psychological consultant who opined that Mr. Jones had no limitations in his mental RFC (*Id.*).

At Step 4, the ALJ determined that Mr. Jones is unable to perform his past relevant work (R. 32). At Step 5, the ALJ concluded that, based on his RFC, jobs exist in significant numbers in the national economy that Mr. Jones can perform (R. 33).

### III.

We will uphold the ALJ's determination if it is supported by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). "The ALJ is not required to

---

[10] While the ALJ stated that Dr. Elmes limited Mr. Jones to a sedentary position, Dr. Elmes's opinion appears to be more limiting than that. This discrepancy does not affect the analysis here.

address every piece of evidence or testimony presented, but must provide "an accurate and logical bridge" between the evidence and her conclusion that a claimant is not disabled." *Kastner*, 697 F.3d at 646 (citing *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).

Mr. Jones argues that the ALJ's decision should be reversed and remanded because it: (1) improperly weighed Dr. Elmes's opinion; (2) failed to properly account for the limitations affecting his concentration, persistence, or pace in his RFC; (3) did not adequately explain how his obesity added to his functional limitations; and (4) improperly assessed his credibility (Pl.'s Br. at 1). For the following reasons, we reject these challenges and find that substantial evidence supports the ALJ's decision.

## A.

Mr. Jones asserts that the ALJ made several errors in evaluating Dr. Elmes's opinion, including: failing to adequately explain how the limitations in Dr. Elmes's RFC opinion were inconsistent with the objective medical record; giving more weight to the opinion of Dr. Sethi, who, unlike Dr. Elmes, was not a specialist, and whose opinion did not discuss functional limitations (Pl.'s Br. at 9-10); constructing an RFC that was not determined by either Dr. Sethi or Dr. Elmes; and concluding that Dr. Elmes's opinion was the product of sympathy for Mr. Jones (doc. # 30: Pl.'s Reply at 3). Dr. Elmes's opinion would have rendered Mr. Jones unable to work, while the ALJ opined that he could do the full physical range of light work with additional mental limitations (R. 24-25); *see* 20 C.F.R. § 404.1567.

Mr. Jones does not have a treating physician, so the only medical opinions in the record were completed at the request of DDS. In addition to Dr. Sethi's and Dr. Elmes's opinions, Dr. Vincent reviewed Dr. Sethi's report and gave an opinion on Mr. Jones's physical RFC. Dr. Vincent opined that Mr. Jones had no exertional limitations and that his only postural limitations

were that he should never climb ladders, ropes, or scaffolds due to his seizure disorder. Although the ALJ did not mention Dr. Vincent by name, the ALJ considered and cited to his opinion (R. 31). The ALJ, however, did not adopt Dr. Vincent's RFC findings. The ALJ limited Mr. Jones exertionally to light work and omitted limitations on ladders, ropes, or scaffolds (R. 32). In addition, the ALJ rejected Dr. Elmes's opinion limiting Mr. Jones to lifting and carrying up to 5 pounds occasionally, sitting for four hours (but only 20 minutes at a time), and standing or walking for 1.5 hours (but only 15 minutes at a time).

Contrary to Mr. Jones's contention, "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). Thus, the ALJ is not required to adopt an RFC as determined by any of the claimant's physicians; rather, it is the responsibility of the ALJ to determine a claimant's RFC. 20 C.F.R. § 404.1545; *see also Newell v. Astrue*, 869 F. Supp. 2d 875, 891 (N.D. Ill. 2012) ("the RFC is a legal decision for the ALJ to make"). "In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict." *Murphy v. Astrue*, 454 F. App'x 514, 518 (7th Cir. 2012) (quoting *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995)).

In assessing a claimant's RFC, the ALJ must consider all of the relevant medical and nonmedical evidence, including objective medical evidence and laboratory findings; medical source statements about what the claimant can still do; descriptions and observations of the claimant's limitations and daily activities; the frequency and intensity of the claimant's pain or other symptoms; and the treatment the claimant receives to alleviate the pain or other symptoms, including medication and the type, dosage, effectiveness, and side effects of it. 20 C.F.R. §§ 404.1545(a)(3); 404.1545(e), 404.1529(c). The ALJ "must weigh the evidence and make

appropriate inferences from the record." *Seamon v. Astrue*, 364 F. App'x 243, 247 (7th Cir. 2010). In addition, the ALJ's RFC assessment must include a "narrative discussion" describing how the evidence supports each conclusion, citing specific medical and nonmedical evidence. SSR 96-8p.

Here, the ALJ included a narrative discussion describing how the medical and non-medical evidence supported her conclusion that Mr. Jones has the RFC for light work with some mental limitations, and we find that the ALJ resolved the conflicts between Dr. Elmes's and Dr. Sethi's opinions "in a reasonable manner." *Murphy*, 454 F. App'x at 518. The ALJ explained that she gave less weight to Dr. Elmes's conclusions as to Mr. Jones's physical functional limitations because they were inconsistent with the other record evidence and the doctor's own examination results, which, as in *Filus v. Astrue*, 694 F.3d 863, 868-69 (7th Cir. 2012), were "overall normal" and thus inconsistent with severe functional limitations.

In addition, the ALJ gave less weight to Dr. Elmes's conclusions because the ALJ found that they were based primarily on Mr. Jones's subjective complaints of pain, which the ALJ did not find credible, rather than on Dr. Elmes's examination results. "[W]here a . . . physician's opinion is based on the claimant's subjective complaints, the ALJ may discount it." *Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013). As we discuss further below, we find that the ALJ "appropriately questioned the genuineness of [Mr. Jones's] complaints of pain." *See Flint v. Colvin*, No. 13 C 1421, 2013 WL 6171015, at *2 (7th Cir. Nov. 26, 2013). In this case, as in *Bates*, it was reasonable that "because the ALJ found that [the claimant] was not credible in h[is] reports of pain, she also gave [Dr. Elmes's] opinion, which relied heavily on these reports, little weight." *Id.*

In sum, the ALJ conducted "a thorough review of [Mr. Jones's] medical records and a reasonable weighing of the evidence both for and against greater RFC limitations," *Seamon*, 364 F. App'x at 248, including physicians' opinions, the claimant's testimony, and the other record evidence, *Schmidt*, 496 F.3d at 845. As in *Seamon* and *Schmidt*, the ALJ here thus did not err in formulating an RFC that was not expressed by a doctor's opinion in the record. *See also Metzger v. Astrue*, 263 F. App'x 529, 532-33 (7th Cir. 2008) (holding that ALJ did not "play doctor" by failing to adopt physicians' opinions of the claimant's RFC, where the ALJ explained her reasons for rejecting the doctors' conclusions, which at times conflicted with the claimant's own statements and other physicians' opinions); *cf. Bailey v. Barnhart*, 473 F. Supp. 2d 822, 839 (N.D. Ill. 2006) (remanding case where ALJ "played doctor" by creating an RFC with no support in the record); *Koppers v. Colvin*, No. 12 C 3993, 2013 WL 4552505, at 12-13 (N.D. Ill. Aug. 28, 2013) (remanding case where ALJ failed to specify what evidence supported limitations in RFC after rejecting RFC opinions of physicians in record).

Furthermore, contrary to plaintiff's arguments, the ALJ's failure to explicitly consider that Dr. Elmes was a "specialist," *i.e.*, an orthopedist, does not warrant remand here (Pl.'s Br. at 9-10). In weighing medical opinions of non-treating physicians, ALJs consider whether the opinion source examined the claimant, the supportability and consistency of the opinion, and whether the opinion source was a specialist. 20 C.F.R. § 404.1527(c). Here, although both Dr. Sethi and Dr. Elmes examined Mr. Jones, only Dr. Elmes was a specialist. However, the ALJ found that Dr. Elmes's opinion as to Mr. Jones's RFC was not supported by, or consistent with, the record, a defect that undermines even a specialist's opinion. The Seventh Circuit's opinion in *Rudicel v. Astrue*, 282 F. App'x 448, 453 (7th Cir. 2008), is instructive. In *Rudicel*, the Seventh Circuit upheld an ALJ's decision to reject the opinion of a specialist where the ALJ

explained that limitations in the specialist's RFC opinion were not supported by sufficient medical evidence and were contradicted by the opinions of other doctors and by the specialist's own previous opinions. *Id.* As in *Rudicel*, the ALJ reasonably found that multiple factors in the record weighed against Dr. Elmes's opinion. Thus, the ALJ's decision to give less weight to Dr. Elmes's opinion was supported by substantial evidence.[11]

Plaintiff puts forth one more argument related to Dr. Elmes's opinion. Mr. Jones argues that because Dr. Elmes's examination was ordered after the hearing,[12] upon rejecting his opinion, the ALJ was required to order another medical consultant's opinion (Pl.'s Br. at 10). The Social Security Administration may request a consultative examination after the hearing where there is insufficient medical evidence to make a disability determination, or to try to resolve an inconsistency in the evidence. 20 C.F.R. § 404.1519a(b).

Mr. Jones cites to *Collins v. Colvin*, No. 12 C 1880, 2013 WL 1284235 (N.D. Ill. Mar. 27, 2013), where the ALJ had ordered another medical consultant's opinion because the ALJ "could not render a decision just based on the information that was available at the time of the hearing." *Id.* at *6. The ALJ subsequently rejected the additional opinion, and we held that the ALJ erred by not "seek[ing] out additional information or explain[ing] why the additional opinion [wa]s no longer necessary to develop the record." *Id.* at *11. By contrast, the ALJ here stated that she had "all of the evidence . . . to take this case back . . . [and] reach a decision" (R. 70). She never professed that Dr. Elmes's examination was necessary to develop the record, and

---

[11] Plaintiff also argues that the ALJ erred in finding that Dr. Elmes was sympathetic to Mr. Jones because Dr. Elmes was retained by DDS for a one-time examination (doc. # 30: Pl.'s Reply at 1 (citing *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012), which found that it was implausible that a state agency doctor was sympathetic to a claimant whom the doctor examined only once). However, the ALJ's comment that Dr. Elmes "may have been sympathetic to the claimant" (R. 28), was only one of several reasons, each sufficient in its own right, that the ALJ gave for giving little weight to Dr. Elmes's RFC opinion. Thus, this comment is not grounds for remand here.

[12] As noted above, there is no evidence as to who from the Social Security Administration ordered Dr. Elmes's consultative examination, or why the additional examination was ordered.

the ALJ was not left with evidentiary gaps in the record when she decided to give little weight to Dr. Elmes's RFC opinion. Thus, in this case, the ALJ did not need to order another consultative examination before issuing her opinion. *See Metzger*, 263 F. App'x at 532-33 (holding that although the ALJ rejected the conclusions of the medical consultants, the ALJ did not need to re-contact them if she could reach her disability determination without more information).[13]

## B.

Next, Mr. Jones contends that the ALJ failed to account for his moderate limitations in concentration, persistence, or pace in his RFC and in the hypotheticals to the VE at the hearing. (Pl.'s Br. at 10-11). We disagree.

At the hearing, the ME, Dr. Rozenfeld, stated that Mr. Jones should be limited to simple tasks in a predictable workplace with routine, repetitive work stresses and limited interaction with the public (R. 64). The ALJ incorporated these limitations when she limited the hypothetical individual "to simple, routine tasks in a non-stressful environment. In an environment where there are not many changes in what he has to do. Limited interaction with the public. . . . Things of a very routine nature" (R. 66). And, in the opinion that followed, the ALJ limited Mr. Jones to "simple routine tasks; limited contact with public, employees, supervisors; and predictable workplace stresses" (R. 24-25).

Mr. Jones argues that a limitation to "simple, routine tasks" does not sufficiently account for his moderate limitations. He relies on *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619-20 (7th Cir. 2010), for the proposition that "in most cases, limiting a claimant to simple, repetitive

---

[13]Moreover, even if the ALJ erred in finding Mr. Jones capable of light work, this error was harmless. We will not remand a case to the ALJ "if we can predict with great confidence that the result on remand would be the same." *Schomas v. Colvin*, 732 F.3d 702, 707-08 (7th Cir. 2013). In *Schomas*, the appellate court held that any error in finding the claimant capable of light work was harmless because two of the three RFC assessments in the medical record did not impose any restriction on sitting, standing, or walking that would preclude light work, and the most recent assessment, which was possibly inconsistent with light work, looked like an outlier. Similarly, in the instant case, Dr. Sethi's opinion that Mr. Jones did not have any exertional limitations was in line with the evidence in the record, while Dr. Elmes's opinion, with its extreme limitations, appears to be an outlier.

tasks does not properly accommodate limitations with regard to concentration, persistence, or pace" (Pl.'s Reply at 5). In *O'Connor-Spinner*, the court held that an ALJ's hypothetical to a VE which included a restriction to repetitive tasks and simple instructions may not sufficiently account for moderate limitations in concentration, persistence, and pace. *O'Connor-Spinner*, 627 F.3d at 618-20. Here, however, the ALJ went further than limiting Mr. Jones to simple, repetitive tasks in the RFC and in her hypothetical to the VE, limiting Mr. Jones to predictable workplace stresses and limiting his interaction with the public and employees. Moreover, there is no evidence here that Mr. Jones's moderate limitations in maintaining concentration, persistence, or pace would lead to more functional limitations than those set forth in the RFC by the ALJ.

Thus, we find that, contrary to Mr. Jones's arguments, the ALJ satisfactorily accounted for limitations affecting Mr. Jones's concentration, persistence, or pace in the RFC.

### C.

Mr. Jones also argues that the ALJ did not explain with sufficient detail how his obesity factored into the RFC (Pl.'s Br. at 12). In her written opinion, the ALJ explained that Mr. Jones met the criteria for obesity, but he never sought treatment for it or complained that his weight affected his daily functioning. Nevertheless, the ALJ considered that obesity could exacerbate Mr. Jones's other impairments, specifically, his back and leg complaints, and the ALJ found that this caused Mr. Jones some limitations.

ALJs must consider obesity when determining the aggregate impact of a claimant's impairments and explain if the obesity does not result in limitations on the claimant's ability to work. *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012). However, it is the claimant's burden to articulate how his obesity exacerbated his underlying conditions and further limited his

functioning. *See Hernandez v. Astrue*, 277 F. App'x 617, 624 (7th Cir. 2008); *Mueller v. Colvin*, 524 F. App'x 282, 286 (7th Cir. 2013).

Here, although neither Mr. Jones's medical records nor his testimony discussed his obesity, the ALJ explained that it could exacerbate some of his other impairments and cause some additional functional limitations. The ALJ accounted for these limitations in the RFC, which limited Mr. Jones to light work, despite Dr. Vincent's opinion that Mr. Jones had no exertional limitations. Thus, far from underestimating the effects of Mr. Jones's obesity, the ALJ provided more detail as to the limitations resulting from Mr. Jones's obesity than Mr. Jones did himself. As such, the ALJ's findings as to Mr. Jones's obesity were sufficiently detailed and supported by substantial evidence.

## D.

Mr. Jones also asserts that the ALJ improperly assessed his credibility. This argument is a non-starter. The law is well-settled that we will not overturn an ALJ's credibility determination unless it is "patently wrong," meaning that it lacks any reasonable explanation or support. *See Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). While the ALJ used oft-criticized boilerplate to describe her finding that Mr. Jones was not credible, "[t]he use of boilerplate is innocuous when, as here, the language is followed by an explanation for rejecting the claimant's testimony." *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013).

The ALJ here provided a thorough analysis of Mr. Jones's credibility, explaining the following contradictions and inconsistencies in Mr. Jones's complaints which undermined his credibility. *First*, the ALJ noted that although Mr. Jones told Dr. Elmes that he could not sit for more than twenty minutes straight, he sat for more than an hour during the hearing without

needing to lie down. *Second*, despite testifying to severe, constant pain, Mr. Jones's complaints of pain to his doctors were inconsistent, and he did not seek more aggressive medical treatment despite being advised to have x-rays taken and to see an orthopedist or a physical or occupational therapist. *Third*, while Mr. Jones argues that he could not afford to seek additional medical treatment (Pl.'s Br. at 18), the ALJ found that this claim was belied by the fact that Mr. Jones repeatedly visited Jackson Park Hospital for treatment of other medical issues. *Fourth*, the ALJ found inconsistencies between Mr. Jones's allegations of functional limitations and other evidence – both medical and non-medical – in the record (R. 26). Thus, the ALJ's credibility determination was supported by substantial evidence.

## CONCLUSION

For the reasons stated above, we deny Mr. Jones's motion to reverse and remand the ALJ's decision (doc. # 24), and we grant the Commissioner's motion to affirm the denial of benefits (doc. # 28).

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATE: January 13, 2014